J-S01031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.J.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.M.G., MOTHER | : | No. 2450 EDA 2019 |

Appeal from the Decree Entered July 31, 2019
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000003-2018

BEFORE:   BOWES, J., KUNSELMAN, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:              **FILED MARCH 11, 2020**

T.M.G. (Mother) appeals from the decree entered July 31, 2019, in the Court of Common Pleas of Philadelphia County, which terminated involuntarily her parental rights to her minor daughter, T.J.J., who was born in November 2014.[1]  Mother's counsel has filed a petition to withdraw and brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).  Upon review, we grant counsel's petition to withdraw and affirm the decree terminating Mother's parental rights.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The parental rights of T.J.J.'s putative father, L.J. (Father), were also terminated involuntarily.  Father did not file an appeal or participate in Mother's appeal.

We provide the following background. Philadelphia Department of Human Services (DHS) became involved with the family in November 2014, after learning that Mother was positive for cocaine at T.J.J.'s birth. N.T., 7/31/2019, at 13. In addition to Mother's drug use, DHS was concerned about domestic violence between Mother and Father, and criminal activity in the home. *Id.* T.J.J. went home with Mother and Father from the hospital, and DHS arranged for the Community Umbrella Agency (CUA) to provide in-home safety services. *Id.* CUA established single case plan objectives for Mother to achieve based on the issues Mother was facing. The objectives included obtaining suitable and safe housing; complying with dual-diagnosis mental health and substance abuse treatment; complying with random drug screens; participating in domestic violence counseling; participating in parenting classes; attending all supervised visits with T.J.J.; and providing documentation of her participation and/or completion of her court-ordered case plan goals. *Id.* at 14-15.

In February 2016, DHS filed a petition for shelter care, followed by a petition seeking to adjudicate T.J.J. dependent under subsection (1) of the Juvenile Act. *See* 42 Pa.C.S. § 6302 (setting forth definition of dependency). Both petitions were granted, and T.J.J. entered foster care. DHS Exhibit 1. The juvenile court ordered Mother to undergo an assessment for substance abuse by the court's Clinical Evaluation Unit (CEU), enroll in dual-diagnosis treatment for mental health and substance abuse, undergo

drug screen monitoring, and undergo domestic violence counseling. *Id.* The juvenile court permitted Mother to visit with T.J.J., who was one year old, two times a week under supervision. *Id.*

On March 15, 2016, Mother entered an inpatient dual-diagnosis substance abuse facility that permitted mothers and children to reside together, and Mother regained legal and physical custody of T.J.J. with protective supervision by DHS. *Id.* By June 2016, however, Mother lost custody of T.J.J. again after the inpatient program discharged Mother. *Id.*; N.T. 7/31/2019, at 14. DHS obtained an emergency custody authorization on June 2, 2016, and placed T.J.J. in foster care. DHS Exhibit 1. At the shelter hearing following T.J.J.'s removal, the juvenile court ordered T.J.J. to remain in foster care, permitted Mother to visit with T.J.J. twice a week under supervision, and ordered Mother to undergo outpatient treatment and drug screens. DHS Exhibit 1.

Over the next three years, Mother never made enough progress to regain custody of T.J.J. Mother never provided CUA with any verification that she had completed a dual-diagnosis treatment program. N.T., 7/31/2019, at 17-18, 63. Mother initially participated in outpatient dual-diagnosis treatment, but the program discharged her in March 2017 due to her lack of compliance with the program. *Id.* at 14, 36, 50. At some point after her discharge, Mother told CUA that she was re-enrolled in treatment, but the facilities Mother named told CUA that was not the case. *Id.* at 17,

51, 63. She never demonstrated a sustained period of sobriety and did not appear for all of her court-ordered random screens. *Id.* Her screens were positive for cocaine in August 2016, November 2017, November 2018, and January 2019; the January 2019 screen was also positive for benzodiazepines. DHS Exhibit 2. Additionally, Mother never underwent the court-ordered CEU drug assessment, as she either failed to appear for the assessment, sign necessary consents, and/or provide verification of outpatient treatment. *Id.*

Mother was also court-ordered to undergo domestic violence counseling. She declined to address this goal, and never provided documentation of successful completion of counseling. N.T., 7/31/2019, at 20, 51, 53. She had obtained a protection from abuse (PFA) order against Father in 2016, but continued to live with Father.[2] *Id.*

Mother declined services for obtaining employment. *Id.* at 20-21. She also did not resolve the concerns with her housing situation. CUA had last visited her home in May 2019. *Id.* at 64. Mother resides with Father and his parents. *Id.* The house had working utilities, but it was very cluttered to the point of possibly inhibiting egress from the home during an

_____

[2] In addition to the domestic violence concerns, Mother's continued relationship with Father complicated matters because Father was only minimally compliant with his case plan objectives. *Id.* at 37.

emergency. *Id.* at 64-65, 75-76. Moreover, Mother would not allow the CUA worker in one of the rooms. *Id.*

Although initially the juvenile court permitted Mother to visit with T.J.J. twice a week, it decreased her visitation to once a week in October 2016. DHS Exhibit 1. It also required Mother to confirm 24 hours in advance and be supervised with a line-of-sight restriction. *Id.* Mother never made enough progress to begin unsupervised visitation, and she was not close to achieving reunification by the time of the termination of parental rights (TPR) hearing. N.T., 7/31/2019, at 34. Although she was consistent with visiting T.J.J. at one point, her more recent visitation attendance drastically decreased, with Mother only making 10 out of 18 visits prior to the hearing. *Id.* at 36. Out of the ten she attended, she was late to three of them. *Id.* at 22.

Based upon Mother's lack of progress, DHS filed a petition to terminate Mother's parental rights on January 3, 2018, as well as a petition to change T.J.J.'s permanency goal to adoption. The juvenile court conducted a hearing on the petitions on July 31, 2019. T.J.J., who was four years old at the time, was represented by an attorney serving as guardian *ad litem* and an attorney serving as legal counsel.[3]

---

[3] Both T.J.J.'s guardian *ad litem* and legal counsel advocated in favor of granting DHS's petition at the hearing. N.T., 7/31/2019, at 140-47. T.J.J.'s legal counsel indicated that he had met with T.J.J. prior to the hearing, but

*(Footnote Continued Next Page)*

During the hearing, DHS presented the testimony of CUA workers who were assigned to the family's case, and introduced without objection Mother's drug screen results, CEU progress reports, and the docket from T.J.J.'s dependency matter, which contained the text of the various court orders. In addition to the history discussed *supra* regarding Mother's lack of progress on her case objectives, DHS presented testimony regarding T.J.J.'s needs and welfare. Angela Rivers, the family's CUA case manager since late 2018, testified that based on the four or five times she had observed T.J.J. with Mother at visits, she believes T.J.J. has a "connection" with Mother and their visits are "positive." N.T., 7/31/2019, at 73. T.J.J. is excited to see her at the beginning of the visit. *Id.* at 87. At the end of the visits, T.J.J. sometimes cried a bit and told Mother, "Mommy, I want to go with you," but ultimately T.J.J. was redirected easily and left with her foster parents without a problem. *Id.* at 56-57. Ms. Rivers does not believe that severing the relationship with Mother would negatively impact T.J.J. *Id.* at 73. Once Mother leaves, T.J.J. goes about her activities and does not mention Mother. *Id*. Based upon this, it appears to Ms. Rivers that the adage "out of sight, out of mind" is applicable. *Id.* When Mother missed visits, T.J.J. did not

_(Footnote Continued)_ ———————————

due to her young age, he did not believe T.J.J. understood the "complexities" of termination. *Id.* at 142-43. When counsel referenced T.J.J.'s parents, T.J.J. identified her foster parents as her parents. *Id.* at 147.

complain or act out. *Id.* at 66. T.J.J. does not talk about Mother to Ms. Rivers when Ms. Rivers visits T.J.J. in the foster home. *Id.* at 88.

At the time of the TPR hearing, T.J.J. had been in foster care for three-and-one-half years. She moved to a pre-adoptive foster home in March 2019. *Id.* at 34. Ms. Rivers had observed T.J.J. refer to both of her foster parents as "Daddy," and when Ms. Rivers asked her where she wanted to live, T.J.J. responded, "with [D]addy," while pointing to the foster parent who was in the room. *Id.* at 55. Ms. Rivers believed the foster parents were meeting all of her medical and developmental needs, whereas Mother had not inquired about such needs. *Id.* at 55-56. T.J.J. looked to her foster parents to meet her needs when she was sick, upset, or otherwise. *Id.* at 56. Her foster parents enrolled her in soccer, and planned to enroll her in dance. *Id.* They provided T.J.J. with "love, safety, stability, and support." *Id.* at 55.

In the opinion of Ms. Rivers, T.J.J. had flourished in the pre-adoptive foster home; she is quite outgoing, "runs the house," has "wonderful" interactions with her foster parents, and really has "integrated into her surroundings." *Id.* at 55. Ms. Rivers believes T.J.J. is bonded to her foster parents. *Id.* at 57. Mother told Ms. Rivers that she thought T.J.J. had gained independence since moving to the pre-adoptive foster home, because she now could spell her name, dress herself, and was secure enough to respond to questions. *Id.* at 59.

T.J.J.'s legal counsel called Mother to testify at the hearing. Mother claimed to be enrolled in a dual-diagnosis program, but she had no documentation of her participation. *Id.* at 96. She also testified that she had engaged in domestic violence counseling while she was in dual-diagnosis inpatient treatment, and claimed she gave the documentation to prior CUA caseworkers. *Id.* Mother admitted that her cocaine use was still an issue. *Id.* at 112. Mother believes there is an "[u]nconditional" bond between her and T.J.J. and they have a "great relationship." *Id.* at 102, 109. Mother testified that she had asked T.J.J. whether she wanted to be reunified with Mother, and T.J.J. told her, "I want to be with you, [M]ommy," although Mother acknowledged T.J.J. also loves and cares about her foster parents. *Id.* at 102.

At the conclusion of the hearing, the juvenile court entered a decree terminating the parental rights of Mother pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal. Mother's counsel later filed a petition to withdraw and *Anders* brief.

We begin by addressing the petition to withdraw and *Anders* brief. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)) ("When faced with a purported *Anders* brief, this Court may not

review the merits of the underlying issues without first passing on the request to withdraw."). This Court extended the **Anders** procedure to appeals from decrees terminating parental rights involuntarily in **In re V.E.**, 611 A.2d 1267 (Pa. Super. 1992). To withdraw pursuant to **Anders**, counsel must comply with the following requirements:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

**Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing **Commonwealth v. Lilley**, 978 A.2d 995, 997 (Pa. Super. 2009)). Counsel must provide this Court with a copy of the letter advising the appellant of his or her rights. **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, our Supreme Court has set forth the following requirements for **Anders** briefs.

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record,

- 9 -

controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361.

In the instant matter, counsel states she filed a petition to withdraw and ***Anders*** brief stating that she conducted a review of the record and determined that Mother's appeal is frivolous. Counsel's brief includes a summary of the facts and procedural history of this case, a list of issues that could arguably support the appeal, and counsel's assessment of why those issues are frivolous, with citations to relevant legal authority. Counsel also provided this Court with a copy of her letter to Mother, which enclosed the petition to withdraw and ***Anders*** brief, and advised Mother of her right to obtain new counsel or proceed *pro se*.[4] However, counsel's citations to the record are rather sparse, with only two appearing in counsel's seven-page statement of the case. ***Anders*** and ***Santiago*** contemplate more thorough citation, as does Pa.R.A.P. 2117(a)(4). Nevertheless, because we have reviewed the record in its entirety, and ***Anders*** and ***Santiago*** require substantial compliance, not perfect compliance, ***see Commonwealth v. Wrecks***, 934 A.2d 1287, 1290 (Pa. Super. 2007), we will not order counsel to submit a new brief with more thorough citations.

---

[4] Mother has filed neither a response to counsel's petition to withdraw nor a brief *pro se* or through new counsel.

Since counsel complied substantially with the requirements of **Anders** and **Santiago**, we may proceed to review the issues outlined in her brief. We must also "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted); **see also Commonwealth v. Dempster**, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*).

Counsel raises the following issues of arguable merit: (1) whether the juvenile court erred by terminating Mother's parental rights without clear and convincing evidence to support termination under 23 Pa.C.S. §§ 2511(a)(1), (2), (5), and (8); and (2) whether the juvenile court erred by terminating Mother's parental rights without clear and convincing evidence that termination would best serve the needs and welfare of T.J.J. pursuant to 23 Pa.C.S. § 2511(b).[5]

We review these issues mindful of our well-settled standard of review.

---

[5] Counsel alludes to error by the juvenile court in changing the permanency goal to adoption. However, Mother only appealed the termination of her parental rights pursuant to the Adoption Act, and did not appeal the goal change pursuant to the Juvenile Act. Nevertheless, even if she had, we note that the juvenile court may terminate parental rights even if the permanency goal remains reunification. **See In re Adoption of S.E.G.**, 901 A.2d 1017, 1029 (Pa. 2006). Any goal-change challenge would be moot in light of our decision to affirm the court's termination decrees. **In re D.R.-W.**, __ A.3d __, 2020 WL 465686 at 9 (Pa. Super. Jan. 29, 2020) (quoting **In re D.A.**, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.")).

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child[.]

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the juvenile court terminated Mother's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under subsections 2511(a)(8) and (b), which provide as follows.

- 12 -

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
>> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1) … or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

We have summarized the requirements of subsection 2511(a)(8) as follows.

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1275-76 (Pa. Super. 2003).

In the instant case, there is no dispute that T.J.J. has been removed from Mother's care for more than 12 months, having been removed for the second time in June 2016 when Mother was discharged from her inpatient dual-diagnosis program. The juvenile court noted that T.J.J. was removed from Mother's care twice due to Mother's substance abuse, and Mother had not progressed in the substance abuse treatment offered to her throughout T.J.J.'s time in foster care. Juvenile Court Opinion, 10/23/2019, at 9.

We discern no abuse of discretion in this conclusion. As reviewed in more detail *supra*, Mother's substance abuse continued to exist at the time of the termination proceedings. She was discharged from inpatient treatment in 2016 without completing the program, discharged from outpatient treatment in 2017, and failed to enroll in or complete any further treatment. She tested positive for cocaine and/or benzodiazepines throughout the life of the case; repeatedly failed to undergo screens and assessments; and admitted at the hearing that she continued to abuse cocaine.

In addition, other longstanding issues continued to be a problem: DHS could not verify that her housing was safe; she had not completed mental health treatment; she remained unemployed; and she remained in a relationship with Father despite domestic violence in the relationship and Father's failure to complete his own court-ordered goals.

In light of the above, it is clear that the conditions, which led to the removal and placement of T.J.J. on two occasions, continued to exist, and the juvenile court did not abuse its discretion in terminating Mother's rights pursuant to subsection 2511(a)(8).[6]

We now examine the juvenile court's determination that termination of parental rights best served T.J.J.'s needs and welfare. We have explained the analysis under subsection 2511(b) as follows.

> [Subs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

---

[6] As our analysis of the last prong of subsection 2511(a)(8) is similar to our analysis under subsection 2511(b), we will address the last prong *infra*.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

Parental rights may be terminated notwithstanding the existence of a parent-child bond. When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1992).

Here, the juvenile court examined the evidence of record and concluded that T.J.J.'s primary bond was with her pre-adoptive foster parents, not Mother, and that T.J.J. would not suffer irreparable emotional harm if Mother's parental rights were terminated. Juvenile Court Opinion, 10/23/2019, at 9-11. Further, the juvenile court noted that Mother has been unable to provide T.J.J. with a healthy, safe environment or meet her emotional, physical, and developmental needs for multiple years in a row. *Id.* Since 2016, T.J.J.'s relationship with Mother had been largely forged during hour-long visitation sessions, and due to Mother's spotty attendance, such contact had been increasingly inconsistent. *Id.* T.J.J. was bonded with her foster parents, and she had experienced progress and stability in their care. *Id.*

Based on the evidence of record as detailed earlier in this memorandum, we discern no abuse of discretion in the juvenile court's

conclusions. T.J.J. has spent most of her short life in foster care. Therefore, the juvenile court did not abuse its discretion in concluding that at this point, the relationship T.J.J. has with her foster parents is the one to protect over the one she has with Mother. While it is clear that T.J.J. enjoys her time with Mother, we agree with the juvenile court that nothing in the record suggests that terminating Mother's parental rights would cause T.J.J. to suffer extreme emotional consequences and sever a relationship that is necessary to T.J.J. Therefore, the juvenile court did not abuse its discretion by determining that T.J.J.'s needs and welfare was best served by terminating Mother's parental rights.

Based upon the foregoing, we agree with counsel that a challenge to the sufficiency of evidence to support the juvenile court's decision to terminate Mother's parental rights pursuant to subsections 2511(a) and (b) has no merit. Additionally, our review of the record reveals no "arguably meritorious issues that counsel, intentionally or not, missed or misstated." **Dempster**, 187 A.3d at 272. Accordingly, we affirm the decree terminating Mother's parental rights and grant counsel's petition to withdraw.

Decree affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/11/20</u>